IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

DANIEL DAWSON,

               Plaintiff,

v.                                           CIVIL ACTION NO. 3:08-0287

KOKOSING CONSTRUCTION COMPANY, INC.,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. 25). For the reasons explained below, the motion is **DENIED**. Plaintiff has proffered evidence sufficient to support a claim for employment discrimination by way of constructive discharge and failure to offer a reasonable accommodation.

**Standard of Review**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from

which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## Background

Plaintiff, Daniel Dawson, has operated heavy equipment for most of his decades-long career. After graduating high school in 1966, he completed a training program focusing on bulldozers and scrapers. He gained experience in the military, where he served until 1970. Dawson suffered a setback in 1972 when he was injured in a motor vehicle accident and his left arm was amputated. He continued to operate heavy equipment but was limited in the range of machines he could operate. At deposition he stated that he now considers himself primarily a bulldozer operator.

Dawson has been a member of the International Union of Operating Engineers Local 132 ("Local 132") since the early 2000's. In March of 2007, Defendant, Kokosing Construction Company, contacted the union to hire operators for a road construction project on West Virginia State Route 35 in Putnam County, West Virginia. The first request, made by Kokosing superintendent Terry Sheba, was for a "D8" bulldozer operator. In response, Tommy Plymale, Local 132's Assistant Business Manager, decided to send Dawson. Dawson agreed to the position and, as the first member assigned, also took on the responsibility of steward. (According to deposition testimony, the steward is tasked with looking out for the union's interests at the job site.)

The Route 35 project was delayed for several weeks, apparently awaiting permit approval. At some point after offering the position to Dawson and before the commencement of work, Terry Sheba learned of Dawson's amputation. He called Kenny Lake, Kokosing's area manager, to let

inform him of the situation. According to Sheba, Lake told him simply to give Dawson a fair chance "just like we do everyone else." There is no evidence that Sheba expressed additional concerns about Dawson's handicap to anyone in the company, the union, or Dawson himself.

On May 24, 2007 Dawson reported to work at the jobsite.[1] He testified that around 7:30 a.m. he approached Terry Sheba and asked which of the bulldozers he was expected to run. Sheba informed Dawson that he would not be running a bulldozer, but instead would be running a Caterpillar 825 compactor.[2] Dawson then told Sheba that he was unable to run the compactor. Specifically he recalls telling Sheba, "I'm not going to get on that machine and make an ass out of myself and give you a reason to dismiss me because I cannot run it efficiently." Dep. of Dan Dawson at 130. Sheba responded by telling him "well, that's what's available." *Id.* Dawson asked "that's it?" and Sheba responded affirmatively. *Id.* Dawson then got in his car, called the Union Hall and asked if Tommy Plymale would be there. Plymale told Dawson he could meet him in two hours; Dawson then left the jobsite.

Dawson contends that he was not qualified to operate the compactor and that he could not have been expected to run it safely or effectively; Defendant disagrees. During deposition Dawson elaborated. The compactor at the job site was equipped with a blade on the front to move dirt, as with a bulldozer or backhoe. Controls for the blade were on the lefthand side. Dawson explained

---

[1] The day prior he had completed a five-hour mandatory training session specific to the Route 35 project.

[2] According to Sheba, he showed Dawson a dozer that he was expected to run and Dawson said that he could not run the machine because of the steering configuration. Sheba then offered Dawson the job of running the compactor. Dawson again refused. Sheba then told Dawson that if he refused to run both pieces of equipment then the only thing to do would be to report back to the union hall.

that, because the compactor pitches as it moves, it is necessary to adjust the blade in order to maintain the same grade. On one occasion after his amputation Dawson had attempted to operate a bladed compactor and was unable to do so. He also argues that, because of his inexperience and because of the different steering configuration, he would not have been able to operate the machine safely. Defendant contends that Dawson would have been able to operate the compactor safely and effectively because the blade was unnecessary for the Route 35 job. According to both Sheba and Plymale, the compactor had very simple controls.[3] Sheba says that he told Dawson that there would be no need to operate the blade. According to Dawson, he did not inquire and was not told about blade operation. He contends, however, that the presence of the blade on the machine demonstrated that it would have been necessary to use it. He equated operating the compactor without the blade to driving a car without its taillights.

Defendants also point out that a work sheet filled out by Dawson at the orientation session indicated that he would be capable of running the compactor. The Form is entitled "Referral Application & New Hire Information Form." One section is styled the "Self Evaluation." Different types of equipment are listed (as well as traits such as "Attitude" and "Learning Ability") with instructions to rate one's skill and ability on a scale of 1 to 5 – with 1 as "No Experience", 3 as "Average," and 5 as "Above Average." Dawson rated himself as a "5" on each of the bulldozers,

---

[3]During deposition Dawson admitted that he would have been able to "drive" the compactor without the blade. Dawson Dep. at 220. This was not, however, an admission that Dawson could have done the job. During the entirety of deposition Dawson distinguished between driving or running a machine and operating a machine: By his definitions, driving or running means making a machine go and operating means driving or running a machine with competence. Dawson also made distinctions between running a machine and running it efficiently. While efficiency usually connotes a degree of quality combined with speed, Dawson seemed to use the term "efficiency" to denote competency.

and a "3" for "Roller/Compactor" among other scores. He also made a note that his skill would depend upon the steering configuration. During deposition Dawson stated that he did not put too much time or thought into these forms. He also testified that he understood rollers and compactors to be different machines; he could operate a roller, but not a bladed compactor.

After Dawson left the jobsite, Sheba called Tommy Plymale to let him know about the situation. Sheba told Plymale that it would be impossible for Dawson to run the D8 dozer on the site because that particular machine was equipped with a "finger steer" controller. When Plymale informed Dawson of this, Dawson decided to investigate for himself. He went to the local Caterpillar Dealer, Walker Machinery, and asked to see the technical manual for their D8 dozer. According to Dawson, none of the D8's are equipped with finger steer controls. To Dawson, this confirmed what had been his experience operating bulldozers over many years. Plymale, however, stated in affidavit that it would not be difficult to obtain a D8 with a finger steer control, despite any description in the technical manual. According to Plymale, any new Caterpillar bulldozer would be made to order and could be equipped as specified by the client.

Dawson met with Plymale at the union hall to discuss the Route 35 project. Plymale recommended to Dawson that he take the position operating the compactor. He explained that it paid the same amount and that Kokosing would guarantee as many hours as he could have expected on the bulldozer. He also informed Dawson that the terms of the collective bargaining agreement, under which Local 132 operated, it was up to the employer to decide upon equipment assignments. (Plymale stated in affidavit that he knew of other, non-handicapped, union members who had been called to the Route 35 jobsite to work on one machine and reassigned by Kokosing.) Despite this Dawson remained steadfast in his refusal to run the compactor.

Plaintiff argues that he was the victim of unlawful discrimination under the West Virginia Human Rights Act. As alternative forms of discrimination he contends he was unlawfully discharged, constructively discharged, and/or not offered a required reasonable accommodation.[4] His theory is that when Sheba learned of his disability, Sheba became concerned about having him run the bulldozer. He points to the fact that Sheba contacted his area manager as evidence of this concern. He posits that, because the bulldozer operator would have been the most important operator on the job, Sheba took it upon himself to ensure it would go to a man without a disability. To keep Dawson off of the bulldozer, Sheba tried to place him on the compactor despite that fact that Dawson could not run it. When Dawson refused to run the compactor, Sheba fired him.

Defendants characterize the facts differently. They argue that pursuant to the collective bargaining agreement Sheba was well within his rights to assign Dawson to the compactor. According to Kokosing the compactor assignment was not a demotion. Defendants claim that they cannot be liable because Dawson choose to leave the job site rather than take on a less preferable assignment. They contend that Dawson could have run the compactor, but he never even tried.

## Analysis

**I. Plaintiff Has Made a *Prima Facie* Showing of Employment Discrimination.**

Under West Virginia Law to make a *prima facie* case for employment discrimination, a plaintiff must demonstrate that three elements are met:

> 1)   That the plaintiff was a member of a protected class.

---

[4]Defendant argues Plaintiff has dropped his claim under Count II of the Complaint for failure to engage in the interactive process. The Court construes Plaintiff's claim for failure to offer a reasonable accommodation as falling within the second count.

> 2) That the employer made an adverse decision concerning the plaintiff.
>
> 3) But for the plaintiff's protected status, the adverse decision would not have been made.

*Conaway v. Eastern Associated Coal Corporation*, Syl. Pt. 3, 358 S.E.2d 423 (W.Va. 1987). If any one of the elements is not established then the claim fails in its entirety.

Once the plaintiff has met his burden to demonstrate a *prima facie* case the burden shifts to his employer "to show some nondiscriminatory reason for the decision." *Id.* at 430. This can be any reason, "except that the plaintiff was a member of the protected class." *Id.* A legitimate reason for the action essentially operates as an affirmative defense. *Id.* Once the defendant has made this showing the plaintiff has an opportunity to rebut the evidence by "showing that the stated reason was merely a pretext for discriminatory motive." *Id.*[5]

### A. The Plaintiff Is a Member of A Protected Class.

There is no dispute that Plaintiff, Dawson, meets the first element of the *Conaway* test. His amputated left arm is a disability which places him in a protected class. *See Duty v. Nortaon Alcoa Propants*, 293 F.3d 481 (8th Cir. 2002) ("The ADA clearly covers typical disabilities such as quadriplegia, paraplegia, cerebral palsy, limb loss, and total blindness or deafness.")

### B. The Plaintiff May Have Suffered From an Adverse Employment Action.

The Plaintiff alleged two different ways in which he was the victim of an adverse employment action. First, he alleges that he was subject to an unlawful discharge. (Alternatively, Plaintiff alleges failure to hire. Because the record establishes that Dawson did work for Kokosing

---

[5]The *Conaway* test was derived from, and mirrors, the *McDonell Douglas* burden shifting approach, nearly ubiquitous in federal employment discrimination cases. Compare *id.* with *McDonnell Douglas Corp. v. Green* , 411 U.S. 792 (1973).

for a brief time, this claim is not supported by the facts.)  Second, he claims that even if he were not subject to a simple discharge, Kokosing's actions constituted a constructive discharge.  The Court finds that because Dawson left the job on his own volition, he was not discharged in the traditional sense.  There is, however, an issue of fact as to whether he was subject to constructive discharge.

### 1. Defendant Did Not Discharge Dawson; Dawson Walked Away From the Job.

Plaintiff's contention that he was discharged by Sheba is unsupported by the facts.  He himself described the situation as follows in his deposition:

> A.[Dawson]   But, you know, I just told him [Terry Sheba], I said, I'm not going to get on that machine [the compactor] and make an ass out of myself and give you a reason to dismiss me because I cannot run it efficiently.
>
> Q.   And what did Terry say?
>
> A.   He said, Well, that's what's available.  An I said, Is that the way it is?  He said, That's the way it is.  At which time I got in my car and called the union hall and said I would be there in a few moments.

Dawson Dep. at 130-31.  Terry Sheba's version of the events is as follows:

> A.   I just called him [Tommy Plymale] whenever Daniel [Dawson] refused to run the D8, which I offered to him at first to run and he refused it.  I offered for him to run the 825 compactor and he refused it, and I said the only thing I know is to report back to the hall, and I called Tommy and told him he was to report out as having him sent back to the hall, he refused to run both pieces of equipment.

Sheba Dep. at 51-52. Although testimony regarding Dawson's exit from the jobsite differs, it is clear that he made the deliberate choice not to work, if not the choice to leave. There was no dismissal from the jobsite that would make this the traditional unlawful discharge case.

Plaintiff does not merely argue that dismissal from the jobsite was actionable, however, he also states, "if the jury believes Dawson's testimony and finds that Kokosing refused or failed to provide the *bulldozer* assignment, the case is over and the jury need not even consider anything further." Because of his contention that the compactor assignment was a lesser role than the bulldozer assignment, he states a theory that dismissal from the bulldozer assignment is actionable by itself. This can only be true, however, if the change of assignments fits the legal definition of an adverse employment decision: it does not.

"The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *James v. Booz-Allen & Hamilton Inc.* 368 F.3d 371, 376 (4th Cir. 2004). A reassignment does not constitute an adverse employment action unless it has some "significant detrimental effect." *Id.* "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). Boone, an African-American working for NASA, was transferred from the Acoustics Research Laboratory to one of the agency's wind tunnels. *Id.* at 255. The wind tunnel assignment was more difficult because of working conditions, her unfamiliarity with the position, and more stringent deadlines. *Id.* Despite these factors, the panel held that the transfer did not qualify as an adverse employment action. *Id.* at 254.

*James* and *Boone*, like many discrimination cases decided in federal courts, was decided under the American with Disabilities Act ("ADA").  ADA cases can be used as guidance for cases filed under the West Virginia Human Rights Act ("WVHRA").  *Hosaflook v. Consolidation Coal Co.* 497 S.E.2d 174, 181 n. 10 (W.Va. 1997) ("[W]e find that cases decided under the ADA are also helpful in deciding our cases under the West Virginia Human Rights Act.")  There do exist, however, a few important differences.  An argument could be made that the West Virginia Supreme Court's meaning of "adverse employment decision" as stated in *Conaway* is different than the "adverse employment action" standard in ADA caselaw.  A single case decided by the West Virginia Supreme Court, however, makes it unlikely that there is a substantial difference in terms. *See Waddell v. John Q Hammons Hotel, Inc.* 572 S.E.2d 925 (W.Va. 2002).

The plaintiff in *Waddell* was a forty-eight year old Executive Housekeeper at the Embassy Suites Hotel in Charleston, WV.  *Id* at 403.  After she had been in the position for about one year, the hotel hired a new employee in the housekeeping department – Mr. Sims.  *Id.*  Mr. Sims was less than forty years old.  As time passed Sims began to take on more and more of the duties of Executive Housekeeper.  *Id.* at 403-04.  At the same time, Ms. Waddell was relieved of many supervisory duties formerly part of her job assignment, such as attending department executive meetings.  *Id.*  She was also subjected to criticism in front of her co-workers and at one point her performance evaluation was left accessible to other employees.  *Id.*  She filed an employment discrimination suit alleging age discrimination.

In language similar to that used by the Fourth Circuit Court of Appeals in defining an adverse employment action, the West Virginia Supreme Court decided that Ms. Waddell had not been the subject of an adverse employment decision.  The court explained,

> Ms. Waddell asserts that the appellees made an adverse decision concerning her employment because her job duties were changed by Mr. Sims. She says that some of her supervisory duties were eliminated and that essentially she was "demoted." However, the record shows that Ms. Waddell retained the title of Executive Housekeeper after Mr. Sims was hired. She continued to work the same hours and had the same general terms and conditions of employment. In addition, Ms. Waddell received at least two pay raises after Mr. Sims began overseeing the housekeeping department.

*Id.* at 404. Although the West Virginia court did not cite to Fourth Circuit caselaw, the factors deemed relevant to the analysis were the same as those in federal cases: compensation, job title, level of responsibility, and opportunity for promotion. Because these factors have been endorsed by both the Fourth Circuit Court of Appeals and the West Virginia Supreme Court, they will be applied to an analysis of the facts of the instant matter.

In Dawson's view an assignment to the compactor was a demotion from that of bulldozer operator. There is some circumstantial evidence that Terry Sheba might have viewed it as less important to the success of the overall project. There is no evidence, however, that it legally constituted an adverse employment action or adverse employment decision. The record shows that Dawson would have been compensated at the same rate and would have worked the same number of hours on the compactor as the bulldozer. There is no evidence that his job title would have been any different. On either the compactor or the bulldozer plaintiff would have born similar responsibility as any other heavy equipment operator on the jobsite. Although this was a contract job and it is unlikely he would have been eligible for any formal promotion, time on the compactor may have actually boosted his resume for other positions because it would have filled a gap in his experience and skill level. Under precedent established in *Boone* and *Waddell* more is needed than

a demonstration that a job is less preferable or of lower profile. *See Boone*, 178 F.3d 253(work in wind tunnel more difficult and less desireable than plaintiff's prior position); *Waddell* 572 S.E.2d 925 (where the elimination of job duties, including attendance at executive meetings, was not sufficient to demonstrate an adverse action). Plaintiff's allegations concerning removal from the bulldozer assignment are directly analogous to those made by Ms. Waddell when some of her duties were reassigned to a younger worker. Plaintiff, like Ms. Waddell, simply has not demonstrated that this reassignment of duties was an adverse employment decision. Dawson's reassignment from the bulldozer, in and of itself, does not qualify as an actionable discharge.

## 2. The Facts Support a Claim for Constructive Discharge.

In West Virginia, to state a *prima facie* case for employment discrimination based on a constructive discharge, "a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit." *May v. Chair and Members, Board of Revieww*, 664 S.E.2d 714, 720 (W.Va. 2008) citing *Slack v. Kanawha County Housing and Redevelopment Authority*, Syl. Pt. 6, 423 S.E.2d 547 (W.Va. 1992).[6]

Dawson has submitted enough evidence on the record to support a claim based on constructive discharge under West Virginia law. Parties disagree about whether Dawson was capable and/or qualified to operate the compactor. Dawson himself testified that he would have

---

[6] This test is one of the instances where the law under the WVHRA diverges from that of the ADA. Under the ADA "a plaintiff must at the outset show that his employer 'deliberately made [his] working conditions intolerable in an effort to induce [him] to quit. *Heiko v. Colombo Savings Bank F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). "An employer's actions are deliberate only if they 'were intended by the employer as an effort to force the plaintiff to quit." *Id.*

been required to use the blade on the machine and that from his past experience he knew he would have been unable to do so. Witnesses in support of the defense stated that it would not have been necessary to use the blade and without it Dawson would have been able to operate the machine. Similarly, Dawson argues that because of his lack of experience, even if he would have been able to make the compactor move, he could not have operated it safely. Defendants dispute this, too. This is a factual issue that must be decided by the jury; at this stage the Court must accept Dawson's version – that he was unable to operate the compactor, or at least unable to operate it safely.

According to Dawson's testimony he informed Terry Sheba, at the jobsite, that he could not operate the compactor. Sheba would therefore have known of Dawson's limitation. Knowing this, he gave Dawson the option of running the compactor or leaving the job – Dawson chose to leave. In this situation, when given the choice of taking on an impossible task (or a task that could not be safely completed) or quitting, a reasonable person might well be compelled to quit. Although Dawson made the choice to leave the job himself, the circumstances support a claim of constructive discharge under the applicable law.

### C. There Exists Circumstantial Evidence of A Discriminatory Motive.

In establishing the third element for a *prima facie* case of discrimination – "[b]ut for the plaintiff's protected status, the adverse decision would not have been made" – the *Conaway* court recognized that direct evidence would be difficult to come by. *Conaway* 358 S.E.2d at 429-30. The Court explained,

> "What is require of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an

> inference that the employment decision was based on an illegal discriminatory criterion."

*Id.* The West Virginia Supreme Court has subsequently recognized that the "but for" language of *Conaway* may have been "unfortunate." *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 161 (W.Va. 1995). The court clarified that "[the] test of discriminatory motive in *Conaway* is merely a threshold inquiry, requiring only a that a plaintiff show an inference of discrimination." *Id. see also* n. 12 ("a plaintiff's burden in making a *prima facie* case is merely to establish an inference that a discriminatory motive entered into the decision").

There exists evidence on the record from which a jury could infer that discriminatory intent entered into Defendant's decision. Terry Sheba was concerned enough about Dawson's disability to call the Kokosing area manager and ask for advice. According to Dawson's version of the facts, Sheba gave him the option of running the compactor (knowing that Dawson could not operate is safely or effectively) or quitting. A jury could infer that Sheba put Dawson in this position because of concerns over Dawson's disability despite the fact that Dawson could have performed other jobs on the project or despite that fact that Dawson could have been given other reasonable accommodations.

Plaintiff has put forth evidence to satisfy the elements of a *prima facie* case of discrimination. According to Defendants version of the facts, Dawson was not given the opportunity to operate the bulldozer because that machine has finger steer controls, which Dawson would be unable to utilize. They further contend that he left the jobsite before he could be offered accommodation on the bulldozer. These facts may go toward undermining the *prima facie* elements of Plaintiff's claim or they may be offered as legitimate reasons for any alleged adverse

employment action. At this point, they are facts to be resolved by the jury and Plaintiff must be allowed to proceed to trial on his claim of constructive discharge.

## II.     Evidence Supports a Claim for Failure to Accomodate.

An employer has an affirmative duty under the WVHRA to accommodate a qualified individual with a disability. *See Skaggs* 479 S.E.2d at 575 (W.Va. 1996) ("To comply with our Human Rights Act, an employer must make reasonable accommodation for known impairments to permit an employee to perform the essential functions of a job.") To state a claim for failure to offer a reasonable accommodation, a plaintiff must show: 1) [he] "is a qualified person with a disability; 2) "[t]he employer was aware of the plaintiff's disability;" 3) "[t]he plaintiff required an accommodation in order for perform the essential functions of the job;" 4) "[a] reasonable accommodation existed that would meet the plaintiffs needs;" 5) "[t]he employer knew or should have known of the plaintiff's needs and of the accommodation;" and 6) [t]he employer failed to provide the accommodation." *Id*. In addition, the court explained that "a plaintiff also could state a claim by alleging an employer refused to consider or discuss accommodation."[7]

Most of the six elements are easily met here. Plaintiff was disabled by virtue of his amputation, and was qualified as evidenced by his decades-long career operating heavy equipment. Kokosing was aware of the disability, as evidenced by Terry Sheba's phone call to his area manager. Plaintiff clearly told Sheba that he could not operate the compactor, and thus Sheba

---

[7]In the parties' briefs, the failure to accommodate claim is treated as a form of adverse action. Under West Virginia caselaw it is generally treated as a separate cause of action with a different test than that used for a general discrimination claim. *See e.g. Skaggs* 479 S.E.2d 561; *Alley v. Charleston Area Medical Center* 602 S.E.2d 506 (W.Va. 2004). While failure to accommodate could reasonably fit within the adverse employment action prong of the general test, because of the separate test and because it was alleged under a separate count of plaintiff's complaint it is treated independently here.

should therefore have known of Dawson's need for an accommodation. According to Dawson's version of the facts, he was not offered an accommodation to help him operate the compactor and was not given any options besides operating that particular machine or leaving the jobsite: The employer, therefore, did not provide an accommodation.

There is a factual dispute over the third and fourth elements of the claim. Plaintiff argues that he was unable to operate the compactor as it was designed to be used. Defendant has proffered testimony that the compactor was one of the more simple machines at the jobsite, and that if Dawson could operate a bulldozer then he would have been capable of running the compactor. Plaintiff also argues that a reasonable accommodation was available – that because he was called to operate a bulldozer, there must have been a bulldozer for him to operate. Defendant again provides contrary facts. He contends that the compactor was the only machine that was available because Dawson was not physically capable of using the finger-steer controls on the bulldozer. At this stage we must give Plaintiff the benefit of the doubt. He has put forth sufficient evidence to create a triable fact for the jury and preclude summary judgment on his claim for failure to accommodate. Dawson's claim for failure to accommodate will also be tried before the jury.

## Conclusion

For the above stated reasons, the Court **DENIES** Defendant's Motion for Summary Judgment (Doc. 25). Plaintiff's claims of constructive discharge and failure to accommodate will proceed to trial. As explained, however, Plaintiff's theory that Defendant's denial of his preferred position resulted in an adverse employment action must fail as a matter of law. It shall not be argued before the jury.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: April 29, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE